IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:13-CV-60-BO

| | |
|---|---|
| RED WOLF COALITION, *et al.*, Plaintiffs, | ) ) ) |
| v. | ) ORDER ) |
| NORTH CAROLINA WILDLIFE RESOURCES COMMISSION, *et al.*, Defendants. | ) ) ) ) |

This cause comes before the Court on defendants' motion to dismiss and plaintiffs' motion for preliminary injunction. A hearing was held on the preliminary injunction motion before the undersigned on February 11, 2014, at Raleigh, North Carolina. Following the hearing, the Court appointed its own expert to consider questions related to the preliminary injunction and the issues raised by the parties. The Court has received the reports of its expert and has incorporated them into the record of this case. A second hearing was held on May 7, 2014, at Elizabeth City, North Carolina to permit the parties an opportunity to examine the Court's expert.

Having considered defendants' motion to dismiss, the Court grants in part and denies in part the motion. Having further considered the filings of the parties, the amicus brief filed by Safari Club International, and the reports of the Court's expert, the Court grants plaintiffs' motion for preliminary injunction.

BACKGROUND

Plaintiffs, three groups of animal advocacy or welfare organizations, filed this action against the North Carolina Wildlife Resources Commission, its executive director, and its

members in their official capacities (the Commission) regarding the Commission's actions related to authorizing, licensing, and permitting the hunting of coyotes within the State of North Carolina. Plaintiffs contend that the Commission's actions have and will continue to cause the illegal take of endangered red wolves in violation of the Endangered Species Act, 16 U.S.C. § 1531, *et seq.*, and its implementing regulations. Plaintiffs seek a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure to enjoin the Commission from authorizing coyote hunting in the area designated for the restoration of red wolves within Dare, Tyrrell, Hyde, Washington, and Beaufort counties, North Carolina. With the exception of defendant Gordon S. Myers, Executive Director of the North Carolina Wildlife Resources Commission, defendants move to dismiss the complaint against them, asserting Eleventh Amendment and legislative immunity.

*History and Reintroduction of Red Wolves*

The red wolf was once common throughout the eastern and south-central United States, but its populations were all but destroyed by the early twentieth century due to predator control programs and degradation of habitat. Wheeler Decl. Ex. H. In 1967, red wolves were first listed as an endangered species under the precursor to the Endangered Species Act. *Id.*; Waits Decl. Ex. M. In 1980, red wolves were thought be extinct in the wild, and the United States Fish and Wildlife Service (USFWS) determined that, in order to save the species from complete extinction, a secured captive breeding program would be required. Wheeler Decl. Ex. B. Once the species was determined to be "safeguarded in captivity, program emphasis shifted to a strategy of reintroduction." *Id.* at 12. In 1987, USFWS reintroduced the red wolf into the Alligator River National Wildlife refuge in eastern North Carolina through the introduction of four pairs that had been bred in captivity. *Id.* at 14.

2

The red wolf recovery area now encompasses roughly 1.7 million acres of land in five eastern North Carolina counties – Dare, Tyrell, Hyde, Beaufort, and Washington. Wheeler Decl. Ex. H. Over the course of twenty years, the wild red wolf population present in North Carolina's five-county red wolf recovery area increased to approximately one hundred and thirty animals, but in the last decade the population of red wolves has stalled or declined, with the current population estimate between ninety and one hundred and ten in the wild. Wheeler Decl. ¶ 17; http://www.fws.gov/redwolf/. The stated objective of the red wolf recovery program is the establishment of two hundred and twenty red wolves in the wild. Wheeler Decl. Ex. B.

*Coyotes in North Carolina*

Coyotes are not native to North Carolina and their absence in North Carolina was noted when USFWS selected the Alligator River Wildlife Refuge as an appropriate location for the red wolf recovery program. Wheeler Decl. Ex. B at 15. North Carolina classifies coyotes as nongame animals, and under this classification the Commission is authorized to set bag and season limits for hunting coyotes as well as trapping limits. Wheeler Decl. Ex. E. In 2012, there were no bag limits or season limits on coyote hunting, but hunting was limited to daylight hours. 15A NCAC 10B.0219 (2012). In July 2013, a permanent rule went into effect which permits coyote hunting on private land anytime during the day or night, on public lands during the day without a permit and at night with a permit, and further permits the use of artificial lights in hunting coyotes at night. 15A NCAC 10B.0219 (2013). There remains no bag or season limit on coyote hunting. *Id.*

A 2012 report by the Commission notes that coyotes can be useful in keeping prey species in balance, but also prey on livestock, deer, and domestic pets. Wheeler Decl. Ex. F. The report further notes that the use of bounties in other states to control coyote populations "has

3

been an ineffective and inefficient tool for controlling coyote populations." *Id.* at 15. The number of coyotes in the red wolf recovery area is currently unknown, but coyotes are thought to outnumber red wolves by at least three to one. Chamberlain Rep. 31 March 2014 at 1.

*Red Wolves & Coyotes in the Red Wolf Recovery Area*

Red wolves prey primarily on white-tailed deer, raccoon, rabbits, and rodents, while coyote diet consists of a wide variety of food sources, including small mammals, rabbits, birds, snakes, frogs, domestic pets, fruit, and berries. Wheeler Decl. Ex. H ; Wheeler Decl. Ex. F. Adult red wolves weigh an average of fifty pounds, stand a little over two feet tall at the shoulder, and are roughly four and a half feet long with their tail. Chamberlain Rep. 22 April 2014 at 3. Coyotes located in the recovery area weigh about thirty pounds, are roughly two feet tall at the shoulder, and are about four feet long with their tail. *Id.* Red wolf pups and adolescents may be quite similar in size to coyotes. Wheeler Decl. Ex. C. Both species may appear to be buff, tan, grey, or reddish brown in color. *Id.* Due to their similarity in size and coloring, coyotes may readily be mistaken for red wolves. Wheeler Decl. Ex. F; Chamberlain Rep. 22 April 2014 at 3.

Stable red wolf territories are achieved through the presence of two breeding adults and their offspring, and the presence of stable red wolf territories prevents infiltration of coyotes into an area. Chamberlain Rep. 31 March 2014 at 2-3. Between January 1 and November 21, 2013, nine red wolves were killed by confirmed or suspected gunshots. Wheeler Dec. Ex. H. At least two red wolf gunshot mortalities in 2013 were admitted to have been caused by a hunter or landowner shooting what he believed to be a coyote. Wheeler Decl. Ex. G. In 2014, two red wolves have been killed by suspected or confirmed gunshot.
http://www.fws.gov/redwolf/index.html (table last updated March 31, 2014). "Currently,

4

mortality from gunshots is the primary cause of death for [red] wolf breeders, [and] such mortality can contribute to instability in [red] wolf packs and influence hybridization [with coyotes]." Chamberlain Rep. 31 March 2014 at 3.

USFWS has adopted an adaptive management plan in order to address the interbreeding between coyotes and red wolves which produces hybrids and erodes the red wolf gene pool. Waits Decl. Ex. M at 10. This plan utilizes a "placeholder" theory, wherein coyotes are sterilized and returned to their territories until they are replaced or displaced by red wolves. *Id.* These placeholder coyotes cannot breed with other coyotes or with red wolves, and further serve to exclude other coyotes or hybrids from their territory. *Id.* Recently, USFWS and the Commission have agreed to conduct further research into the management of all canids on the Albemarle Peninsula, and such research could include testing the efficacy and necessity of continuing the sterilization of coyotes for use as placeholders in the red wolf recovery area. Myers Aff. ¶ 8; Myers Aff. Ex. B at Attach. A.

## DISCUSSION

### MOTION TO DISMISS

All but one of defendants seek dismissal of the complaint against them under Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure. The moving defendants assert that the Court lacks subject matter jurisdiction over the North Carolina Wildlife Resources Commission (NCWRC) and its commissioners under the doctrines of Eleventh Amendment and legislative immunity.

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a claim for lack of subject matter jurisdiction. When subject matter jurisdiction is challenged, the plaintiff has the burden of proving jurisdiction to survive the motion. *Evans v. B.F. Perkins Co.*, 166 F.3d 642,

5

647-50 (4th Cir. 1999). "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The movant's motion to dismiss should be granted if the material jurisdictional facts are not in dispute and the movant is entitled to prevail as a matter of law. *Id.*

The Eleventh Amendment bars suit against non-consenting states by private individuals in federal court. *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). This guarantee applies not only to suits against the State itself but also to suits where "one of [the State's] agencies or departments is named as the defendant." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Plaintiffs do not contest that the NCWRC is protected from suit by Eleventh Amendment immunity. Thus, defendants' motion to dismiss the NCWRC as immune from suit is granted. Defendants' argument that the individual commissioners should also be dismissed, however, fails.

The doctrine of *Ex Parte Young*, 209 U.S. 123, 159-60 (1908), provides an exception to Eleventh Amendment immunity where suit is brought against state officials and "(1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir.1998). "[A] court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective'" to determine if *Ex Parte Young* applies, *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645, (2002) (citation omitted), and injunction suits have been permitted to proceed against other state commissioners under similar circumstances. *See e.g. Aransas Project v. Shaw*, 835 F. Supp.2d

251, 266 (S.D.Tx. 2011) (*Ex parte Young* exception applied to suit against officials of the Texas Commission on Environmental Quality where plaintiffs sought only prospective injunctive relief for ongoing violations of the Endangered Species Act).

The instant complaint alleges an ongoing violation of the Endangered Species Act's prohibition on unauthorized takes and all relief sought by plaintiffs is prospective. Plaintiffs' claims against the commissioners of the NCWRC are also properly considered as claims against state officials. While defendants are correct to note that there must be some "special relation between the officer being sued and the challenged statute before" the *Ex parte Young* exception may be invoked, such special relation is present here. *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (quotation and citation omitted). The defendant commissioners are clothed with specific statutory duties to *prescribe* the manner of take and set limits on hunting seasons for wild animals classified as non-game animals, including coyotes, as well as more generally to *administer* the laws relating to game, freshwater fishes, and other wildlife resources. N.C. Gen. Stat. §§ 113-291.1; 113-291.2; 143-239. Defendant commissioners do not "merely possesses general authority to enforce the laws of the state," *McBurney*, 616 F.3d at 399, but rather have "proximity to and responsibility for the challenged action." *S. Carolina Wildlife Fed. v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008) (emphasis omitted). Thus, the defendant commissioners are not protected by Eleventh Amendment immunity and are proper defendants under *Ex parte Young*.

Finally, legislative immunity does not bar plaintiffs' claims against defendant commissioners. Legislative immunity is absolute immunity provided to officials when they perform legislative or quasi-legislative functions. *Supreme Court of Va. v. Consumers Union of United States, Inc.*, 446 U.S. 719, 731-33 (1980); *Spallone v. United States*, 493 U.S. 265, 278

7

(1990). The specific actions alleged in plaintiffs' complaint are not legislative or quasi-legislative actions, but rather are executive and administrative actions which are not protected by the doctrine of legislative immunity. *Alexander v. Holdren*, 66 F.3d 62, 65 (4th Cir. 1995). Whether an act is administrative or legislative is determined by looking to whether it relates to or impacts specific individuals or whether it concerns general policy or state of affairs. *Id.* at 66. Plaintiffs in their complaint specifically challenge the *permitting* of individuals to hunt coyotes, not any general policy of the state concerning coyote hunting, and thus legislative immunity does not apply.

Accordingly, NCWRC is dismissed from this action as the claims against it are barred by the Eleventh Amendment. Plaintiffs' claims against the individual commissioners and the executive director may proceed.

## Motion for Preliminary Injunction

Before a preliminary injunction may issue, a court must determine that the movant has demonstrated each of four elements: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).

I. Likelihood of Success on the Merits

Plaintiffs filed this action for declaratory and injunctive relief alleging that defendants are causing the unlawful take of red wolves to be committed by authorizing coyote hunting within

8

the red wolf recovery area through its rules, licensing, and permitting, in violation of Section 9 of the Endangered Species Act (ESA). 16 U.S.C. § 1538(a)(1)(G). Section 9 of the ESA makes it unlawful to, *inter alia*, "violate any regulation pertaining to [an endangered] species or to any threatened species". *Id.* Section 9 specifically prohibits the "take" of an endangered species without authorization; take is defined by the ESA as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) (quoting 16 U.S.C. § 1532(19)).

The ESA extends its protection to three categories of species: endangered, threatened, and essential or nonessential experimental populations. *Animal Welfare Inst. v. Martin*, 588 F. Supp.2d 70, 97 (D. Me. 2008). A nonessential experimental population is defined as an endangered species outside of its current range. *Id.* Experimental populations are treated as threatened species under the ESA, 16 U.S.C. § 1539(j)(2)(c) (Section 10(j)), and threatened species, though not afforded all of the protections afforded to endangered species, remain within the ESA's prohibition on unlawful taking. *Id.* at 98 n. 21.

Red wolves in captivity are listed as endangered. Waits Decl. Ex. M at 27. Red wolves in the wild, including those in the recovery program in Eastern North Carolina, are designated as a nonessential experimental population and are therefore subject to protective regulations that have been established for their conservation. *Gibbs*, 214 F.3d at 487-88 (discussing enactment of Section 10(j) in response to local opposition to the reintroduction of certain species in order to allow for looser standards than those that would traditionally apply under the ESA). The red wolf experimental population regulations expressly extend the prohibition on taking under Section 9 to the red wolf population, subject to certain exceptions. 50 C.F.R. § 17.84(c); *see also Gibbs*, 214 F.3d at 488. The red wolf regulations (or 10(j) rules) provide that no person may

9

take a red wolf except with a permit and for valid educational or scientific purposes or in the following relevant circumstances within the red wolf recovery area:

> (i) Any person may take red wolves found on private land in the areas defined ... Provided that such taking is not intentional or willful, or is in defense of that person's own life or the lives of others; and that such taking is reported within 24 hours to the refuge manager (for the red wolf population defined in paragraph (c)(9)(i) of this section), the Park superintendent (for the red wolf population defined in paragraph (c)(9)(ii) of this section), or the State wildlife enforcement officer for investigation.
>
> (ii) Any person may take red wolves found on lands owned or managed by Federal, State, or local government agencies ..., Provided that such taking is incidental to lawful activities, is unavoidable, unintentional, and not exhibiting a lack of reasonable due care, or is in defense of that person's own life or the lives of others, and that such taking is reported within 24 hours ....
>
> (iii) Any private landowner, or any other individual having his or her permission, may take red wolves found on his or her property ... when the wolves are in the act of killing livestock or pets, Provided that freshly wounded or killed livestock or pets are evident and that all such taking shall be reported within 24 hours ....
>
> (iv) Any private landowner, or any other individual having his or her permission, may harass red wolves found on his or her property ..., Provided that all such harassment is by methods that are not lethal or physically injurious to the red wolf and is reported within 24 hours ....
>
> (v) Any private landowner may take red wolves found on his or her property ... after efforts by project personnel to capture such animals have been abandoned, Provided that the Service project leader or biologist has approved such actions in writing and all such taking shall be reported within 24 hours ....

50 C.F.R. § 17.84(4)(i)-(v). These exceptions to the general prohibition on the taking of red wolves were introduced "in order to insure that other agencies and the public would accept the proposed reintroduction" of red wolves within the red wolf recovery area. *Gibbs*, 214 F.3d at 488.

Plaintiffs contend that by allowing coyotes to be hunted in the five-county red wolf recovery area, the Commission is causing the take of red wolves by significantly increasing the likelihood of red wolf gunshot mortality due to hunters' mistake of a red wolf for a coyote, as

10

well as by causing harm and harassment of red wolves through the disruption of breeding when members of red wolf breeding pairs are killed and when sterile, placeholder coyotes are killed. Plaintiffs further contend that, though any unlawful take of a red wolf is by an individual and not the Commission itself, the Commission's authorization of activities that allow unlawful takes to occur cause it to be liable as a third party.

Both Section 9 of the ESA and the red wolf 10(j) rules expressly apply to any person who "causes to be committed" an unlawful take. 16 U.S.C. § 1538(g); 50 C.F.R. 1784(c)(8). Person is defined by the ESA to include "any officer, employee, agent, department, or instrumentality... of any State, municipality, or political subdivision of a State". 16 U.S.C. § 1532(13). Applying these provisions, other courts have held that third party liability is appropriate under the ESA and that "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA." *Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997).

In *Animal Welfare Institute v. Martin*, the District of Maine considered whether the Maine Department of Inland Fisheries and Wildlife's permitting of the use of a particular kind of trap intended for other animals but which could also trap Canada lynx, a threatened species under the ESA, caused incidental takes in violation of the ESA. 588 F. Supp.2d 70 (D. Me. 2008). In finding that it did, the court held both that the mere fact that the Canada lynx was listed as a threatened and not an endangered species did not "take it outside the prohibitions against a take" found in Section 9 of the ESA, and that the State's actions in regulating trapping were sufficiently proximate to subject it to liability for incidental takes actually perpetrated by citizen trappers. *Id.* at 98-99. "[B]y authorizing trapping, Maine creates the likelihood that lynx—along with the preferred animal—will find its way into a trap." *Id.* at 99.

11

This precise circumstance is present here. Even experts have difficulty distinguishing between coyotes and red wolves when observing them in the field, much less when they are observed at night. Chamberlain Rep. 22 April 2014 at 3. By authorizing coyote hunting in the five-county red wolf recovery area, and in particular by authorizing coyote hunting during all seasons and at any time day or night, the Commission has increased the likelihood that a red wolf will be shot, or that a breeding pair will be dismantled or a placeholder coyote killed. The Commission may therefore be liable for the unauthorized takes of red wolves where its actions have greatly increased the likelihood of the take.

The Commission relies heavily on the term "non-essential experimental population" to distinguish the red wolf from other species protected by the ESA, arguing that the red wolf should be afforded far less protection than any other protected species from activities that would increase the likelihood of the species' demise. In essence, the Commission suggests that Congress' mandated protection of the red wolf is nothing more than a half-hearted attempt to "see what happens" after a few red wolves have been reintroduced into the wild, but such suggestion utterly fails to take instruction from a prior attempt to put the rights of hunters and private landowners above Congress' clear mandate to prevent the extinction of the red wolf and reintroduce the species to the wild. As the Fourth Circuit has already held regarding this nonessential experimental population, "it would be perverse indeed if a species nearing extinction were found to be beyond Congress's power to protect" it. *Gibbs*, 214 F.3d at 498. By designating the red wolf as protected and dedicating funding and efforts for more than twenty-five years in a program to rehabilitate the once-nearly extinct species, Congress has repeatedly demonstrated that it has chosen to preserve the red wolf – not simply to let inaction determine its

12

Case 2:13-cv-00060-BO   Document 84   Filed 05/13/14   Page 12 of 17

fate – and it is not for this Court to permit activities that would have an effect counter to this goal. *See Gibbs*, 214 F.3d at 496.

It is for this reason that the 10(j) exceptions to the prohibition on taking of red wolves do not create a safe harbor for the Commission's permitting of coyote hunting in the red wolf recovery area. The 10(j) rules do provide an exception for the taking of a red wolf where it is unavoidable, unintentional, and not exhibiting a lack of reasonable due care, but the similarities between the red wolf and the coyote would make it nearly impossible to exercise reasonable due care to avoid shooting a red wolf when coyote hunting. The evidence presented in this matter thus far amply supports that even trained biologists have difficulty distinguishing coyotes from red wolves in the field. This difficulty would become a near impossibility at night. Thus, this is not an instance where a protected animal not intended for the trap merely wanders in, but is one where the permitting and encouragement of the hunting of one species greatly improves the chances that a protected species will be taken. The effects of the unauthorized take of red wolves on the recovery program are clear: "[g]unshot mortality of red wolves reduces the number of breeding animals, disrupts population dynamics, reduces recruitment, and increases an opportunity for hybridization between wolves and coyotes." Wheeler Decl. Ex. D. at 2. Additionally, by permitting the shooting of sterile placeholder coyotes currently employed in USFWS's adaptive management plan,[1] the Commission's actions may operate to increase the number of coyotes present in the recovery area and the opportunity for hybridization, further eroding the red wolf recovery program's efforts. *Id.*

---

[1] The Commission's argument that the placeholder theory generates some debate amongst scientists and may be revised or discontinued in the future management of the red wolf recovery area is of no import. The placeholder strategy remains in use today, and the question of whether it is sufficiently effective is not one before this Court.

13

Finally, the evidence presented sufficiently demonstrates that plaintiffs will be able to establish that in the absence of an injunction prohibiting coyote hunting in the recovery area there is a reasonable certainty of imminent harm, killing, or wounding of red wolves. *See Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp.2d 540, 563-64 (D. Md. 2009) (adopting a standard requiring less than absolute certainty of imminent harm to endangered species in order to succeed on Section 9 claim for permanent injunction). As the USFWS has noted, the Commission's permitting of coyote hunting has caused the taking of red wolves, and the inclusion of night hunting of coyotes only increases the threat of killing or injuring a protected red wolf. Wheeler Decl. Ex. D at 2. As "the future threat of a even single taking is sufficient to invoke the authority of the Act," *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 896 F. Supp. 1170, 1180 (M.D. Fla. 1995), the Court finds that the demonstrated past and potential for future harm is sufficient to support the entry of a preliminary injunction.

Thus, plaintiffs have demonstrated that they are likely to succeed on the merits of their claim that the actions of the Commission are causing the unauthorized take of red wolves as prohibited by the Endangered Species Act.

II.  IRREPARABLE HARM

The USFWS has recognized that gunshot mortality must be addressed in order to maintain and continue the success of the red wolf recovery program. Waits Decl. Ex. M at 28-29. Certainly money damages cannot remedy the red wolf mortalities brought about by coyote hunting, nor could damages remedy an overall decline in the red wolf population through the disruption of USFWS's activities to prevent interbreeding with coyotes. Moreover, any harm to plaintiffs and their group members through the unauthorized taking of red wolves is also irreparable, as environmental and aesthetic injuries by their nature are not adequately remedied

14

by money damages and have permanent or long-lasting effects. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 454 (1987). Plaintiffs' members have clearly demonstrated that their ability to enjoy red wolves in the wild and the forced contemplation of an increase in red wolf mortality would cause them to suffer irreparable harm. *See e.g.* Beeland Decl. ¶¶ 20-22; Storie Decl. ¶ 12-17; Wheeler Decl. Ex. G. Plaintiffs have therefore satisfied this requirement for the issuance of a preliminary injunction. *See also Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (aesthetic injury inflicted by sight or contemplation of harm to protected species not remediable by money damages and irreparable).

III. BALANCE OF EQUITIES & PUBLIC INTEREST

"Under the ESA . . . the balancing and public interest prongs have been answered by Congress' determination that the 'balance of hardships and the public interest tips heavily in favor of protected species,'" *Strahan*, 127 F.3d 155, 160 (1st Cir. 1997) (quoting *National Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508, 1510 (9th Cir.1994)), and "[t]he equitable scales are always tipped in favor of the endangered or threatened species." *Alliance for the Wild Rockies v. Krueger*, 950 F. Supp.2d 1196, 1200 (D. Mont. 2013). The Court finds no basis upon which to disturb Congress' finding in this regard.

While the Commission correctly notes that the reintroduction of the red wolf into the recovery area did in fact require an appropriate balancing of landowners' interests with those of the USFWS in rehabilitating the wild red wolf population, balancing of those same interests in relation to the permitting of coyote hunting need not result, as the Commission suggests, in unfettered permission to shoot "nuisance" coyotes. "Extinction, after all, is irreversible," *Gibbs* 214 F.3d at 496, and any actions by the Commission which would serve to degrade the protected and fragile red wolf population threaten to run afoul of the ESA. Further, any injunction or

15

future rules related to coyote hunting in the five-county recovery area may be properly and narrowly tailored to serve the interests of both the red wolf recovery program and the landowners located there. Thus, having considered the equities and the public interest in this matter, the Court finds that plaintiffs have demonstrated that these two factors tip in favor of the issuance of a preliminary injunction.

The Court finds therefore that plaintiffs have satisfied their burden to demonstrate each of the requisite elements and that the extraordinary remedy of a preliminary injunction is appropriate. *Munaf v. Geren*, 533 U.S. 674, 689 (2008).

IV. SECURITY

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the Court must consider whether plaintiffs should provide security in an amount sufficient to pay the costs and damages sustained by any party found to have been wrongfully enjoined. Neither party having briefed this issue, the Court conducts its own review of the facts and circumstances to determine whether, in its discretion, a security is appropriate. The Court finds that a nominal bond in the amount of $100 is appropriate in this instance as enforcement of the ESA is in the public interest and plaintiffs are public interest groups who might otherwise be barred from obtaining meaningful judicial review were the bond required more than nominal.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss [DE 34] is GRANTED IN PART and DENIED IN PART. Defendant North Carolina Wildlife Resources Commission is DISMISSED from this action.

Plaintiffs' motion for preliminary injunction [DE 38] is GRANTED. Plaintiffs are ORDERED to provide security to the Court in the amount of $100 not later than June 1, 2014.

Hunting coyotes pursuant to 15A NCAC 10B.0219 in the five-county red wolf recovery area is hereby preliminarily ENJOINED. Entry of this preliminary injunction on coyote hunting will support the exclusion of coyotes in the five-county red wolf recovery area by promoting breeding pairs of red wolves which, in conjunction with sterile placeholder coyotes, appear to effect a better deterrent to the increase in coyote population than an increase in coyote hunting deaths would. A further intended benefit of this preliminary injunction is both the preservation and enhancement of the red wolf and deer populations in this area.

The Court is not inclined, however, to provide greater protection to the coyote than that which is applicable to the red wolf. Therefore, during the pendency of the preliminary injunction, the following exceptions apply to the prohibition on coyote hunting in the five-county red wolf recovery area: a coyote may be shot in defense of a person's safety or the safety of others, or if livestock or pets are threatened. Each exception shall apply subject to reporting of such shooting to defendants within twenty-four hours, and defendants shall maintain a record of reports of coyote shootings for review by the Court. This injunction is not applicable to the activities of scientists and researchers associated with USFWS and the Commission, nor does it have any effect on the trapping of coyotes.

Further, this preliminary injunction shall not remain in effect without review for the entirety of the duration of this lawsuit. As the evidence and data are further developed in this matter, the Court shall revisit the efficacy and necessity of this preliminary injunction one hundred and eighty (180) days following the date of entry of this order.

SO ORDERED, this __13__ day of May, 2014.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

17